COUNTY SEAT: REMOVAL: Petition not invalid due to claims that signatures not personally observed by affiants: Effect of conditional offer of site and funds for construction.

April 10, 1995                                                                                               106-e

Michelle E. Moren
Roseau County Attorney
Office of the Roseau County Attorney
309 1/2 Third Street NW
P.O. Box 239
Roseau, MN 56751

Dear Ms. Moren:

In your communication with our office you provided substantially the following:

## FACTS

A petition drive is underway to secure signatures of persons supporting a change in the county seat of Roseau from the City of Roseau to the City of Warroad.[1] Signatures for the petition have been collected, at least in part, by means of separate cards distributed in person or by mail to individuals within Roseau County inviting legal voters of the county to complete, sign and return the cards to the petition proponents in person or by mail.[2] You note that Minn.

---

1. See Op. Att. Gen. 106-3 January 24, 1995 wherein we addressed issues concerning qualifications of signers of such petitions.

2. The form of the petition cards are substantially as follows:

   To the County Board of Roseau, Minnesota:

   The undersigned legal voter of the County of Roseau requests that the County Seat be changed to Warroad.

   | Signature | Date |
   |---|---|
   | Name (please print) First, MI, Last | Phone |
   | Address | City, State, Zip |

   To sign this petition you must be a resident of Roseau County, a United States Citizen and 18 years of age or older. If sufficient signatures are collected, a special election will be held to vote on the question of changing the County Seat to Warroad.

Stat. § 372.01 (1994) requires that such a petition, when presented to the county auditor, must be accompanied by affidavits of at least two of the signers stating that

(a)   the petition signatures are genuine,

(b)   they were signed within 60 days before the date of the affidavits, and

(c)   when signing the petition the petitioners were legal voters of the county.

Minn. Stat. § 372.01 (1994)

Petition proponents have stated that they intend to take various steps to verify the genuineness of the signatures and other data submitted including telephoning each person submitting a card by mail and checking petition signatures against signatures on the county's voter registration lists where possible.[3]

In connection with the petition efforts, funds amounting to $4.5 Million have been contributed to the City of Warroad to be used in construction of a new courthouse, social services complex and jail. The City of Warroad, by resolution of its city council on February 13, 1995, has resolved to "provide" to Roseau County, if the county seat is moved to Warroad:

1.   land located in Warroad suitable as a site for the courthouse and related buildings;

2.   utility and road access to the site, and

3.   costs of construction up to $4.5 Million.

The resolution further provides that if the county seat is moved from Warroad within 25 years from the date of the "gift," the ownership of the land, buildings and related improvements will revert to the City of Warroad. It is not clear whether the funds, property and improvements to be provided by the City of Warroad pursuant to the resolution would be sufficient to cover all building and related costs associated with relocating the county seat.

You then ask substantially the following questions:

---

3.   In Op. Atty. Gen. 106-e, January 24, 1995, we concluded that lack of registration did not disqualify a person otherwise qualified from signing the petition.

## QUESTION ONE

Will the petition, as presented to the County be "invalid" if signers of the required affidavits do not have "personal knowledge" concerning the genuineness of all signatures submitted?

## OPINION

We answer your question, as we understand it, in the negative.

In the context of the facts supplied, we interpret the question as asking whether the petition, when submitted, may be rejected solely on the basis of, information and belief on the part of county officials that each signer of the required affidavits did not personally witness the affixing of each signature to the petition. While there does exist authority for the proposition that the required affidavits should be based, at least in part, upon "personal knowledge," it does not appear that the legislature has required that the knowledge supporting the affidavits necessarily must be based upon the affiant's witnessing the signing in person. Furthermore, the applicable statutes do not appear to provide any mechanism for invalidation of the petition merely by attacking the credibility of the affiants.

Unlike some other statutes dealing with petitions. Minn. Stat. § 372.01 does not require an affidavit stating that signatures were affixed in the physical presence of the affiant. Cf. Minn. Stat. §§ 110A.10 (creation of water user district) 122.22, subd. 4 (Petition for Dissolution of School District) § 410.12 (petition for city charter amendment). All that is required is that at least two petitioners assert by affidavit that the petition signatures are genuine. were affixed within 60 days of the affidavit. and represent legal voters. The legislature does not specify the requisite basis for the affidavits. nor has it provided any authority or mechanism within the context of chapter 372 whereby the basis for the assertions may be evaluated or rejected by county officials.

Michelle E. Moren
Page 4
April 10, 1995

It is true that in many cases, assertions in an affidavit must be based only upon "personal knowledge". See, e.g., Minn. R. Civ. P. 56.05. However, it is not always necessary that the "knowledge" necessary to support each assertion contained in an affidavit must be acquired by direct sense perception. Cf. State v. Mollberg, 246 N.W.2d 463 (1976). (Affidavit supporting issuance of a search warrant need not be based upon personal observation if magistrate informed of underlying circumstances from which informant's conclusions are drawn).

There is also authority for the proposition that, when an affidavit must necessarily be based on information derived from others or upon affiant's opinions, it may be made upon "information and belief." See, e.g., Callenius v. Blair, 309 N.W.2d 415 (Ia. 1981). It seems clear that, at least the legal voter status of persons signing the petition, is a matter which must, of necessity, be based upon information acquired from statements or records of others. Arguably, though, the "genuineness" of the signatures is a matter which can be to a greater degree, based upon direct observation.[4]   Such a distinction was articulated in Op. Atty. Gen. 125 a-19, May 31, 1928, where we concluded that statements as to the genuineness of the signatures and the time of signing were required to be made upon the "personal knowledge" of the affiants while the legal voter status could be based upon "information and belief." At that time, the statute required that the petition be:

> . . .accompanied by affidavits of not less than two of the signers thereof stating that, to the knowledge of affiants, the signatures to such petition are genuine, were subscribed thereto within sixty days preceding the date of such affidavits, and that affiants are informed and believe that at the time of signing such petition the petitioners were legal voters of said county,

---

4. A person might actually observe a signature being placed on a petition. However, it would seem that the identity of the signer would still require reliance upon hearsay or other record inquiry in many cases.

That wording was amended to the current language by Minn. Laws 1985, ch. 109, § 3. Thus, the statute no longer makes an express distinction among the assertions required in the affidavit. Even if it is conceded that such a distinction may be inferred,[5] however, it does not follow that "knowledge"of the genuineness of a signature may only be obtained by observing the writing of it. As noted above, the Legislature in a number of other statutes has specifically required affiants to assert that petitions were signed in their presence. The failure to require such an assertion here would seem to be an indication that such personal observation is not absolutely required to support an affidavit that the signatures are "genuine."

Furthermore, regardless of the factual basis which theoretically may be required to support the affidavits, there appears no statutory mechanism whereby that factual basis may be tested as a basis to reject the petition.

The functions of the county auditor in connection with receiving the petition and ordering a special county board meeting are purely ministerial. If the requisite number of signatures and the affidavits, regular on their face, are presented, it is the duty of the auditor to make the required order and notice, and move the process to the county board for its consideration of the petition pursuant to Minn. Stat. § 372.03. There appears to be no authority for the auditor to delve behind the face of the documents to inquire into their basis. In Op. Atty. Gen. 125a-19, May 31, 1928, cited above, we found a petition improper because the affidavit supporting it lacked any statement that the signatures were genuine. However, the opinion also went on to state:

> The auditor is controlled by the prima facie showing made by the affidavits accompanying the petition. If these affidavits on their face disclose compliance with all precedent statutory conditions, you are advised that it is the ministerial duty of the auditor to receive and file the petition. He is not authorized to go back of the prima facie showing made by the affidavits.

---

5.  As noted in Op. Atty. Gen 106-e Jan. 24, 1995, it is our view that the 1985 amendments to section 372.01 were not intended to make substantive changes in the statutory requirements.

(Emphasis added). See also Slingerland v. Norton, 61 N.W.322, 59 Minn. 351 (1894) Op. Atty. Gen 125, a-19.

It appears that inquiry into the sufficiency of the petition is expressly delegated to the county board pursuant to section 372.03. That inquiry is directed exclusively to the issues pertinent to the petition signatures themselves rather than the affidavits.

For these reasons, it is our view that the petition may not be rejected solely on the basis of collateral information suggesting that the affiants may not have personally observed each signature included in the petition.

## QUESTION TWO

Is the "offer" by the City of Warroad to provide money, land, roads and utilities for a courthouse and related buildings if the county seat is moved to Warroad a "valid offer?"

## OPINION

We are not in a position to provide a complete response to this question since the answer, in our view, may depend in part upon issues which are beyond the scope of our opinions.[6] Your letter suggests that one basis upon which the offer might be questioned is a claim that it is contrary to legal principles protecting the fairness of the election process. In particular, Minn. Stat. § 211B.13, subd. 1 (1994) provides in part:

A person who willfully, directly or indirectly, advances pays, gives, promises, or lends any money, food, liquor, clothing, entertainment, or other thing of monetary value, or who offers, promises, or endeavors to obtain any money, position, appointment, employment, or other valuable consideration, to or for a person, in order to induce a voter to refrain from voting, or to vote in a particular way, at an election, is guilty of a felony.

---

6. In accepting your description of the City's action as an "offer", we do not undertake to determine the extent to which the city council's resolution imposes legally binding obligations upon the city to perform the acts specified if the "offer" is accepted by the county board, or if the voters do, in fact vote to relocate the county seat.

It may well be argued that an offer to underwrite an expense which would otherwise fall to the taxpayers must be considered a promise of money to induce each taxpaying voter to vote in a particular way, in violation of this section.

While we are aware of no Minnesota case directly on point, and there is a possibility that such an "offer" could be found to violate section 211B.13, it is our view that the weight of authority tips against such a determination. We find a number of prior opinions of this office which have held that it is a violation of an earlier version of this section for a candidate for office to offer to serve without pay, or for reduced pay, if elected. See, e.g., Ops. Atty. Gen. 104 a-9, January 29, 1932 which concluded that an offer by a candidate for elective office to serve at a reduced salary was a violation of a predecessor of this statute, noting:

> The result is, as the courts have pointed out, that if such offers were permitted it would tend to put an office up at auction for sale to the lowest bidder. A person of means, having some personal and perhaps ulterior motive for seeking a certain office, might secure his election through such an offer, defeating a better qualified candidate who, for lack of a sufficient private income, could not afford to meet the offer. Thus the object of an election, which should be to choose public servants on their merits, regardless of wealth or other irrelevant considerations, would be frustrated.

See also, Ops. Atty. Gen. 627 a. May 9, 1922, and June 12, 1922. Accordingly, in Op. Atty. Gen. 627B-3, January 20. 1920, the office concluded that an offer of a free site or money toward courthouse construction in a referendum context "might constitute" a violation of the election bribery laws. Thus, it was determined that the only "safe course" was to advise that the offer was unlawful.

In a later opinion, however, we expressly superseded the 1920 decision and concluded that it was not a violation of the "Corrupt Practices Act" for persons to make an offer of a gift of land and money to assist in courthouse construction, contingent upon the outcome of an election to relocate the county seat of Chippewa County. Op. Atty. Gen. 627-B-3, May 6,

1954. While noting a split of authority in other states, we determined that the majority of cases had concluded that offers of money or property to local governments contingent upon courthouse relocation did not violate statutes similar to Minnesota's anti-bribery laws. We noted that:

> The theory back of these decisions appears to be that "the party to be influenced is the entire county, and that the thing offered is of a public nature pertaining to the pubic and not to individuals"; that the elements requisite to constitute a bribery or a corrupt and unlawful influence within the meaning of bribery and corrupt practices statutes are lacking; and that "a self-governing people are self-respecting, and that whole communities will not do any act that reflects upon their honor or integrity."

See also annot. 13 ALR 734. We have not located any additional authorities which suggest that the weight of authority has shifted since the 1954 opinion was issued. Nor has the legislature acted directly to alter the conclusion reached there. Furthermore, we think it relevant that in both the instant case and that addressed in the 1954 opinion, the substance of the offer is addressed to an issue directly pertinent to the issue to be voted upon. I.e., potential costs associated with moving the county seat. Consequently, we retain the view that an offer of the sort described in your letter would not likely be held to violate Minn. Stat. § 211B.13 (1994).

It should be noted that this opinion is limited to the facts presented where the offer in question is made to a governmental unit and has a direct relationship with the ballot question itself. Furthermore, it does not apply to elections of a candidate for public office,[7] nor to offers which bear no connection to the ballot question before the voters.

---

7. Cf. State v. Purdy, 36 Wis., 213, 224 (1874) where the court noted:

> The distinction between the election of public officers, to whom, for the time being, the exercise of the functions of sovereignty is entrusted, and the mere choice of a site for a public building, is quite apparent. The former involves, or may involve, the integrity of the government and the preservation of the principles upon which it is founded, while the latter is only a matter of public convenience or pecuniary interest, involving no fundamental principle whatever."

Another potential area of concern is the question of the authority of the City of Warroad to provide funds or property for the construction of a county courthouse. It is well established that statutory cities possess only those powers expressly granted by statute or those necessarily implied therefrom. As a general matter, cities lack the power to donate to private entities or other governmental units absent specific statutory authority.[8] We have located no statute which expressly authorizes a statutory city to participate in the construction of a county courthouse per se. We are aware of Minn. Stat. §§ 374.25 (1994) et seq, which provides authority for certain cities and counties to construct and maintain a joint courthouse and city hall according to the terms of those sections. However, the materials submitted do not suggest that such a dual purpose structure is contemplated here.

Minn. Stat. § 465.035, provides general authority for a statutory city to convey lands belonging to the city to a county, for public use, for nominal consideration or without consideration. If the land in question belongs to the city, and is not needed for city purposes, this section would appear to provide authority for the city to convey it to the county for courthouse purposes. However, absent other statutory authority, the city would arguably lack authority to acquire land solely for the purpose of transfer under that section. Cf. Op. Atty. Gen. 469A-12, February 24, 1964 wherein we concluded that a village could not acquire property for the purpose of transfer pursuant to former Minn. Stat. § 465.026 (see now section Minn. Stat. § 469.185 (1994)).

We are not aware of specific statutory authority relied upon for the city to donate funds to the county for purposes of erecting a courthouse. It has been suggested that such authority might be derived from Minn. Stat. § 471.85 which permits cities to transfer "personal

---

8.  Cf. Op.s Atty. Gen. 59a-3, January 15, 1959 (County Historical Society); 469-A-12, February 24, 1964 (private nursing home); 476 B-2, January 26, 1942 (federal civil defense agency), December 12, 1946 (study to promote new county); February 23, 1951 (conservation district).

property" without consideration to another public corporation for public use. In Op. Atty. Gen. 904, June 27, 1963, however, concluded that "personal property" as used in that section did not include money or funds of the governmental unit proposing to make a transfer.

Absent other statutory authority which has not been called to our attention, it would not appear that the City of Warroad has clear authority to provide funds for courthouse construction. The fact that funds for the courthouse were acquired by the city as a gift from a private source would not necessarily provide authority, otherwise lacking, for the city to aid in courthouse construction. Cf. Op. Atty. Gen. 469-A-12, February 24, 1964 and Minn. Stat. § 465.036 (1994) which expressly authorizes cities and counties to accept gifts to aid in building equipping or maintaining hospitals whether maintained by a city, county or a combination thereof.

## QUESTION THREE

If the offer is valid, can the County Commission accept this type of gift?

## OPINION

As a general proposition, it has been held that a county may accept a gift of money or property to be used in furtherance of lawful county purposes including construction of a courthouse or other necessary buildings. As determined in Op. Atty. Gen. 627-B-3, May 6, 1954, a county board, in the exercise of sound discretion, may accept an offer of a free site for a courthouse and funds to assist in construction pursuant to Minn. Stat. § 465.03, which provides:

> Any city, county, school district or town may accept a grant or devise of real or personal property and maintain such property for the benefit of its citizens in accordance with the terms prescribed by the donor. Nothing herein shall authorize such acceptance or use for religious or sectarian purposes. Every such acceptance shall be by resolution of the governing body adopted by a two-thirds majority of its members, expressing such terms in full.

You have raised a particular question over the fact that the offered assistance may not be sufficient to cover all of the county's costs of locating the courthouse and other facilities in Warroad, should it be chosen as the new county seat. We do not believe that such a concern would create legal impediment to the county's ultimate acceptance of the offer. While the offer of assistance is conditioned upon the relocation of the county seat to Warroad, we would not style the proposed transaction as an undertaking by the county board to move the county seat to Warroad in exchange for the offered assistance. The decision whether to locate the county seat is an issue to be decided by the voters. If the Board determines that sufficient valid petition signatures have been submitted, an election will be held to determine the location of the county seat. If the voters determine to relocate the county seat in Warroad, that move will entail certain expenses regardless of whether outside assistance is obtained. While it may be that the offered assistance would not be sufficient to pay all costs of relocation,[9] it seems clear that, absent such assistance, the county would be obligated to meet all of the costs from its own resources.

The fact that the offer is contingent upon relocation of the county seat does not in itself render it unacceptable. As noted in Op. Atty. Gen. 627-B-3, May 6, 1954:

> "[such a gift] I assume would be on condition that property so accepted will be returned to the offerers if the voters of the county shall not petition as by law required and legally vote at a duly called election in favor of removal of the count seat. . . ."

It would appear clearly that an offer of land and funds to aid in construction of county seat facilities in Warroad would be essentially meaningless if the county seat were not to be located

---

9. We understand that there may be some dispute concerning this issue. However, we do not undertake in opinions to resolve factual issues. See Op. Atty. Gen 629A, May 9, 1975.

there. Indeed there may be no necessity for the Board to consider the proposal unless the relocation is directed by the voters.

Also of concern may be the provision in the Warroad resolution that, if the county seat is later removed from Warroad "within twenty-five years from the date of the gift, then the ownership of the land, courthouse and related improvements shall revert to the City of Warroad. . ." (Emphasis added).

Pursuant to Minn. Stat. § 372.09 (1994), citizens of the county are permitted to petition for another election to move the county seat after five years have passed following such an election. Thus, it is theoretically possible that the county seat, if located in Warroad, might be relocated elsewhere within the twenty-five year period specified in the resolution.

Inasmuch as no particular formal contract or conveyance is presented, we are not in a position to speculate concerning the form such a transaction might ultimately take. We might say, however, that as a general proposition, prior authorities have recognized the power of units of local government to hold property subject to reversionary interests in the grantor. See, e.g., Op. Atty. Gen. 469a-15, November 20, 1969.

Thus, to the extent that the reversion provision relates to continued use of the property granted by the city for the purposes for which it was given, it would likely be upheld.

The statement that the land, courthouse and improvements "revert" to the city suggests that title to those properties will be in the city prior to transfer to the county. However, to the extent that the condition were to constitute an obligation by the county to transfer to the city, county property not acquired as part of the original grant from the city, the county's authority to undertake such obligation is somewhat less clear. Cf. Op. Atty. Gen. 469 a-12, December 15, 1950 (village may not accept property subject to obligation to pay off indebtedness). 622I-7, April 28, 1960 (authority to convey land for nominal consideration premised upon no present or anticipated need by grantor). Thus, the county board's authority

to accept the conditions on the "gift" are rather dependent upon the form of the particular transactions.

Notwithstanding authority to accept, however, it is clear that the county board has the authority to decline the offer if in its view the consequences of acceptance or the conditions thereon are not in the public interest.

Best regards,


HUBERT H. HUMPHREY III
Attorney General


KENNETH E RASCHKE, JR.
Assistant Attorney General

KER:sr.fe8